UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| v. | ) CR. NO. 05 -246 – 05,06  (RMC) |
| | ) |
| | ) |
| JOSE LUIS CONTRERAS-MACEDAS, et al. | ) |
| (PEDRO HERNANDEZ CARLON and | ) |
| REMEGIO GONZALEZ- OLVERA) | ) |

**DEFENDANTS' HERNANDEZ-CARLON'S AND GONZALEZ-OLVERA'S REPLY TO
GOVERNMENTS RESPONSE TO DEFENDANTS MOTION TO DISMISS ON
SPEEDY TRIAL GROUNDS AND NOTICE OF INFORMATION FROM ICE**

The defendants Pedro Hernandez-Carlon (Def.#5) and Remegio Gonzalez-Olvera (Def.#6), through undersigned counsel, respectfully submit the following Reply to the Government's response to the motion to dismiss the superseding indictment on speedy trial grounds:

**FACTUAL BACKGROUND**

1. As asserted on the *Government' Notice of Information from ICE*, on August 2, 2005, both defendants were "administratively" arrested; each signed a stipulated request for removal on that same date; their Deportation Orders were signed by an Immigration Judge on August 12, 2005; and both defendants were not arrested pursuant to the execution of criminal arrest warrants until October 5, 2005.  (Both defendants had been indicted on September 22, 2005.)

**Mr. Hernandez-Carlon**

2. By August 2, 2005, Operation Card Shark, an investigation into criminal organizations involved in the manufacture and distribution of counterfeit identity (I.D.)

documents in the area of the 1600 to 1800 blocks of Columbia Road NW had been ongoing for three years and four months. (P.H.C. Exh. # 4 at 4.; Hearing (Hr.) 2/13/06 at 98.) On July 6, 19, 21, 25, and 26, 2005, Agent Mark Leeper observed a Dodge Shadow vehicle driven by a Hispanic male, later identified as the defendant, making deliveries of documents back and forth between the area of the 1700 block of Columbia Road NW and a document mill located at 526 Tuckerman Street NW. (*P.H.C. Exh. #4* at 6-11; *Hr. 2/13/06* at 97-100). On the date of Mr. Hernandez-Carlon's "administrative arrest" at his residence in Hyattsville, MD, the police located the same Dodge vehicle parked there, conducted a "consent search" of the vehicle, and seized therein a notebook that contained a detailed list of the days of the week and of the persons involved in the manufacturing of the documents. (*Hr. 2/13/06* at 96, 99-100.) Agent Leeper believed that the notebook strongly connected the defendant to the criminal conspiracy, and that by August 2, 2005, he clearly had probable cause to charge Mr. Hernandez-Carlon with document fraud. (*Id*. at 100, 106). On September 1, 2005, after the defendant was advised of his rights to remain silent and to appointed counsel, Agents Mark Leeper and Heath Simon took a sworn written statement from him in which he acknowledged, *inter alia*, that he had brought orders for false documents from Columbia Road to Tuckerman, and delivered the finished documents back again, about ten times. (*P.H.C. Exh. #3*; *Hrg. 2/13/06* at 102.).

**Mr. Gonzalez-Olvera**

3. Mr. Gonzalez-Olvera was " administratively arrested" in the early morning hours at 4910 Kansas Avenue, N.W., one of the locations that the agents had already connected to the individuals involved in the illegal document business. That morning, they searched his car and recovered incriminating documents from the trunk, showing

2

payment ledgers for illegal document runners. (See *G.O. Exh. #7*). Several weeks after the Removal Order was signed, the criminal investigators obtained the assistance of the "deportation officers," and had Mr. Gonzalez-Olvera brought to ICE Headquarters to be interviewed. (*Hr. 2/13/06 78-80*). On or about September 1, 2005, approximately two weeks after the Removal Order was signed, the same criminal investigators who interviewed this defendant on August 2nd regarding the Stipulated Request for Removal Order again conducted the interview. (*Id.*) They read him a notification of rights that was virtually identical to the rights he was given when he signed the Request for Stipulated Removal. (Compare *G. O. Exhs. #s 2 & 5;* See *Hr. 2/13/06 82-84*). The explanation of rights provided no clue that the purpose of this interview was different than the prior one, which dealt only with the deportation issues. (*Id.*) Mr. Gonzalez-Olvera then gave a statement that significantly strengthened the government's case against him. (*G.O. Exhs. #s 5-6*).

**<u>ANALYSIS</u>**

4. The ruse exception (to the general non-applicability of the Speedy Trial Act ("STA") to civil detentions by INS/ICE) provides protection for detained aliens and should be applied when the defendant demonstrates that the primary purpose for the civil detention is to hold him for criminal prosecution. United States v. De La Pena-Juarez, 214 F. 3d 594, 598 (5th Cir. 2000); Accord United States v. Noel, 231 F. 3d 833 (11th Cir. 2000). The STA must also be applied when there is evidence of collusion between INS/ICE and the prosecuting authority, or evidence that the detention was for the sole or primary purpose of preparing for criminal prosecution. United States v. Cepeda-Luna, 98

F.2d 353, 354 (9th Cir. 1993.) In cases where a deportable alien is being held and a speedy trial violation is alleged, "the issue before (the) Court is whether the Defendant's detention was primarily civil or criminal in nature." United States v. Bravo, 2004 WL 1535787 at 1. In Bravo, a case on all fours with both defendants' predicaments here, the defendant was not indicted until almost two months after his arrest as a deportable alien, despite evidence that the ICE agent knew at the time of arrest that the primary purpose in arresting him was to proceed with a criminal prosecution; the agent also wanted to assure that the defendant was not deported before he was indicted. *Id*. at 2. The District Judge ruled that the agent had probable cause to arrest for a criminal offense at the time of the arrest, that the defendant therefore had been awaiting trial on criminal charges from the outset of his detention--and that dismissal with prejudice based upon a violation of the thirty-day limit of the S.T.A. was the appropriate remedy. Id.

     5. Based upon their extensive observation of the movements of Mr. Hernandez-Carlon, and his connection to the Dodge vehicle from which the incriminating notebook was seized, the police clearly had probable cause to arrest him on August 2, 2005. Likewise, the police had also seized similarly incriminating evidence from Mr. Gonzalez-Olvera on August 2, 2005. As such, each was in effect awaiting trial on criminal charges from that date forward. See Id. In addition, the methods employed by the ICE agents during and after their "administrative arrests" of the four defendants arrested on August 2, 2005, to include Mr. Hernandez-Carlon and Mr. Gonzalez-Olvera, as well as Mr. Lopez-Vargas and Mr. Aguilar-Gomez, were solely designed to prepare for their criminal prosecutions. Each of the defendants was arrested and transported to ICE Headquarters in Fairfax, Virginia after it was determined that each was in the United States illegally.

Each was advised of *Miranda* type warnings, and was offered an opportunity to elect a streamlined procedure for removal to their home countries. Each indicated a desire to cooperate in a procedure that offered them expedited removal. Three of the defendants signed a Stipulated Request For Removal Order and Waiver of Hearing, thereby authorizing an Immigration Judge to enter an Order Granting Stipulated Removal without a conducting a hearing. The fourth defendant had a prior deportation order reinstated. ICE thereafter made arrangements for these defendants to be held at one of the regional jails pending deportation.

  6. The defendants were quickly able to see that their decisions to cooperate with the ICE agents was a good one, as the Orders Granting Stipulated Removal were signed in approximately 10 days. Thereafter, with the defendants believing that they were going home shortly, criminal investigators requested that the ICE agents assigned to deportation make arrangements for these individuals to be transported to ICE Headquarters where the criminal investigators would interview them. In this manner, the "deportation officers" came to know that the criminal investigators were still interested in these defendants, and ICE was also able to hold the defendants up to the full 90 days in order to give the investigators time to initiate the anticipated criminal prosecution.

  7. Also, despite Agent Leeper's attempts to build one during his testimony, the record establishes that there is no "wall" separating the deportation and the criminal investigation sides of ICE. In fact, Agent Arrietta explained how the deportation agents are in the same building and have to be involved with the criminal investigators, because he and others in his position coordinate the transportation arrangements with the investigators. In addition, Agent Arrietta confirmed that ICE has no further need to talk

5

to detainees in reference to their deportation once the order of removal has been signed. As such, the "deportation officers," as they assisted in arranging the interviews, had to know that the requests to interview each defendant were related to anticipated criminal prosecution.

       8. Both Mr. Hernandez-Carlon and Mr. Gonzalez-Olvera were brought to ICE Headquarters on September 1, 2005, a little more than two weeks after the Removal Orders were signed. The criminal investigators then provided each with a Notification of Rights that was virtually identical to the Notification of Rights each was given when he signed the Request for Stipulated Removal. The latter Notification provided no clue that the purpose of the subsequent interview was any different than the prior one, which had addressed deportation issues only.  Each defendant was confident in the knowledge that his earlier cooperation had resulted in the issuance of an expedited removal order.  By confusing the defendants in this manner, the government's procedure proved an effective tool to assure that each would waive his rights and provide an incriminating statement that bolstered the criminal prosecution.  (The same procedures were also followed for each of the other two defendants who were arrested on August 2nd.)   Like clockwork, within two weeks of the Orders for stipulated removal, the ICE investigators had contacted agents on the Administrative side and requested that these defendants be brought to ICE headquarters for interviews; not coincidentally, each interview produced an incriminating statement from an unwitting detainee who attained criminal defendant status shortly thereafter.

       9. Whether or not ICE detained these defendants beyond the 90-day administrative target period for removal does not factor into the Speedy Trial Act

calculus here. See United States v. Okuda, 675 F. Supp. 1552 (D. Hawaii 1987) (defendant's arrest by INS initiated the 30 day S.T.A. period where Government intended to charge defendant with same criminal charge as immigration violation; case dismissed with prejudice although complaint was filed only three days after arrest and indictment filed thirty one days thereafter). On the contrary, the 90- day period provided additional time for the criminal investigators to strengthen their cases in direct defiance of the dictates of the Speedy Trial Act. See United States v. Pena, 73 F. Supp. 2d 56, 59 (D. Mass. 1999) (indictment 50 days after initial arrest by INS held to be violation of S.T.A. where no effort was made to take steps necessary to deport defendant, and detention served only to facilitate preparation of the criminal case; indictment dismissed with prejudice). Not surprisingly, each of the defendants was criminally charged in this case within a period not likely to be effected by the removal order, but well beyond the 30-day speedy trial indictment deadline in criminal cases.

      10. The consistent use of this investigative approach lies at the heart of the defendants' claims for dismissal. The agents arrested these individuals during their pursuit of "Operation Cardshark," a longstanding criminal investigation that had already resulted in the indictment of several coconspirators. When they took the defendants into custody on August 2, 2005, they had more than probable cause to arrest each for document fraud and related offenses. They chose to categorize each detention as "administrative" solely as a tactic to attain additional inculpatory evidence. ("The critical issue is the substance of the restraint, not the semantic terminology for the arrest." United

7

States v. Osunde, 638 F. Supp 171,  (N.D. Cal. 1986).)  As Agent Leeper and his fellow agents chose to briefly put on their administrative hats, they fully understood that they were already wearing criminal arrest outfits.[1]  While this quick makeover proved effective from their law enforcement perspective, in the process the agents violated the Speedy Trial Act rights of the defendants.

**Wherefore**, the defendants request that the indictment be dismissed with prejudice. [2]

Respectfully submitted,

Mitchell M. Seltzer, Bar #261933
717 D Street, NW, #310
Washington, D.C. 20004
(202) 347-233
Counsel for Defendant Hernandez-Carlon

Howard B. Katzoff, Bar # 348292
717 D Street, NW, #310
Washington, D.C. 20004
(202) 783-6414
Counsel for Defendant Gonzalez-Olvera

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing motion has been served electronically upon Fred Yette, A.U.S.A., United States Attorney's Office, 555 Fourth Street, N.W., Washington, D.C.  20530, and upon each defense counsel of record this -10th - day of April, 2006.

_____
M.M. Seltzer

---

[1] Agent Leeper testified that as an immigration agent, he had dual arrest powers—i.e. civil and administrative powers, as well as criminal arrest powers.  *Hr. 2/6/06* at 6.
[2] The dismissal should be with prejudice, as the overall conduct of the agents was purposeful, and the government's intended deportation of the defendants will still be accomplished.